**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
**CATHERINE LAINE,**                                       :
                                                           :
                              **Plaintiff,**               :          **REPORT AND**
                                                           :          **RECOMMENDATION**
        **-against-**                                      :
                                                           :          **07 Civ. 1251 (KMK)(LMS)**
**COMMISSIONER OF SOCIAL SECURITY,**                       :
                                                           :
                              **Defendant.**               :
                                                           :
---------------------------------------------------------------X

**TO:    THE HONORABLE KENNETH M. KARAS, U.S.D.J.**

        Catherine Laine brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review

of the final decision of the Commissioner of Social Security (the "Commissioner"), which found

that she was not entitled to disability insurance benefits under the Social Security Act ("the

Act").  Currently pending before the Court are the Commissioner's motion and Plaintiff's cross-

motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure (Docket #'s 10, 11, 14, 15).  Because I find that the Commissioner's decision

regarding Plaintiff's claims employed the proper legal standards and is supported by substantial

evidence, I conclude, and respectfully recommend that Your Honor should conclude, that the

Commissioner's motion should be granted, Plaintiff's cross-motion should be denied, and the

case should be dismissed.

**I.      BACKGROUND**

        **A.      Procedural History**

        On May 25, 2004, Plaintiff filed her application for a period of disability and disability

insurance benefits.  Administrative Record ("AR") 52.  Plaintiff alleged that she had become

unable to work because of her "disabling condition on December 6, 2002."  Id.  She alleged that

she had attempted to return to work in early 2003, but that she had been able to return for only two weeks.  AR 54.  Plaintiff's application for disability was denied on September 21, 2004, on the ground that Plaintiff "[could] perform light work" and "a job which [could] be performed with one arm."  Id. 27.  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and she submitted evidence and a memorandum setting forth her position with respect to her claim.  Id. 28, 32, 128-29.  Plaintiff appeared in person for the March 8, 2006, hearing before ALJ Brian W. Lemoine.  Id. 263.  At the hearing, Plaintiff was represented by Irwin Silverman, Esq., and Donald Slive appeared and testified as a vocational expert.  Id.

Following the March 8, 2006, hearing, the ALJ issued a decision on March 24, 2006, finding that Plaintiff was not under a disability within the meaning of the Act at any time through the date of his decision.  AR 12-20.  Plaintiff filed a request for review of the ALJ's decision with the Appeals Council.  Id. 8, 259-62.  On December 20, 2006, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  Id. 4.

On February 20, 2007, Plaintiff commenced the instant action in this Court (Docket # 1), alleging that she had been "totally and permanently disabled within the meaning of the Law as a result of severe impairments of her [n]eck, [r]ight [s]houlder and [r]ight [e]lbow" and that the ALJ's findings "were not supported by substantial evidence."  Docket # 1.  After filing an Answer (Docket # 7), the Commissioner filed a motion for judgment on the pleadings on the ground that the ALJ's decision was supported by substantial evidence.  Docket #'s 10,11.  Plaintiff cross-moved for judgment on the pleadings, arguing that the ALJ applied incorrect legal standards and that the ALJ's decision was not supported by substantial evidence.  Docket # 14.

2

B.     **Medical Evidence**

1.     **Evidence from Plaintiff's Treating and Consultative Physicians**

Beginning on December 11, 2002, Plaintiff sought treatment from Dr. Anna Polifrone for injuries that she sustained on December 6, 2002.  AR 52,143.  Plaintiff reported that she had fallen on her right wrist at work.  Id. 143.  On examination, Plaintiff had tenderness over the primal radius and pain with pronation and supination, but she had no gross deformity.  Id.  Dr. Polifrone noted that Plaintiff's neurovascular status was intact, but that an x-ray showed a fracture of the radial head in satisfactory alignment.  Id.  Dr. Polifrone reported "closed reduction and sling immobilization," and she instructed Plaintiff that she should not work for two weeks. Id.

On December 20, 2002, Plaintiff returned to Dr. Polifrone where she reported increased pain in her elbow and shoulder.  AR 143.  On examination, Plaintiff's elbow had some tenderness over the proximal radius with some clicking on pronation and supination.  Id. Plaintiff's wrist motion was maintained, and there was no neurovascular compromise.  Id.  Dr. Polifrone reported that Plaintiff had significant limitations in her right shoulder motion, generalized anterior tenderness, good strength against resistance, and some slight subacromial and some bicipital groove tenderness.  Id.  An x-ray of Plaintiff's shoulder was negative, but an x-ray of Plaintiff's elbow showed a small crack which may have been related to the radial head or the proximal ulna.  Id.  Dr. Polifrone noted that she did not believe that there was  any significant structural abnormality in the elbow, and she instructed Plaintiff to continue with the sling.  Id.  She also advised Plaintiff to do some home exercises for the shoulder.  AR 143.

On January 10, 2003, Dr. Polifrone reported that Plaintiff had gained an increased range of motion of the right elbow, but that Plaintiff still had significant limitations in her right

shoulder motion.  AR 142.  An x-ray of Plaintiff's elbow showed satisfactory alignment.  Id.  Dr.

Polifrone observed that Plaintiff had 90 degrees of forward flexion and abduction which was 15

degrees short of full extension.  Id.

       Two weeks later, Plaintiff returned to Dr. Polifrone, who reported that Plaintiff still had

limited flexion to 90 degrees of the elbow with almost full extension, had tenderness over the

medial side with no deformity, and had significant limitations in her shoulder motion with 120

degrees of abduction and 50% of internal rotation.  AR 141.  An MRI scan of Plaintiff's shoulder

showed a partial undersurface tear of the supraspinatus, and an x-ray of her elbow showed some

small calcific deposits.  Id.  Dr. Polifrone noted that Plaintiff had been participating in physical

therapy, and she recommended that Plaintiff continue aggressive therapy.  Id.

       On February 7, 2003, Dr. Polifrone reported that Plaintiff continued having trouble with

her elbow.  AR 141.  Plaintiff had about 20 to 100 degrees of flexion, and she was still limited

by her right shoulder pain.  Id.  Dr. Polifrone recommended that Plaintiff continue vigorous

physical therapy.  Id.  Later in February, Plaintiff reported to Dr. Polifrone that she had had

tenderness in her right shoulder.  Id. 140.  On examination, Plaintiff actively abducted her right

shoulder to 90 degrees.  Id.  As reported by Dr. Polifrone, Plaintiff was "[p]ositive impingement

sign, negative apprehension test."  Id.  Dr. Polifrone noted that she discussed various options

with Plaintiff for the shoulder pain, and she injected Plaintiff with Depomedrol and Marcaine in

the right shoulder subacromial space.  Id.

       Plaintiff continued reporting significant problems on March 12, 2003, including

significant spasms in the right paracervical area and significant limitations in right shoulder

motion.  AR 140.  Dr. Polifrone observed 90 degrees of abduction and forward flexion, and she

reported a partial rotator cuff tear.  Id.  Dr. Polifrone recommended that Plaintiff continue

4

therapy for an additional month, and she prescribed Skelaxin and Mobic for muscle relaxation and pain management.  Id.

In an April 11, 2003, progress report, Dr. Polifrone noted that Plaintiff continued having pain in the right paracervical area about C5-C6.  AR 139.  On examination, Plaintiff had limited range of motion with obvious spasm in the associated area as well as significant limitation in motion about the right shoulder and significant subacromial tenderness.  Id.  Dr. Polifrone reported pain in Plaintiff's impingement arc, but she noted no gross neurologic deficit.  Id.  Dr. Polifrone injected Plaintiff's subacromial space as well as the paravertebral nerve distribution of the cervical spine.  Id.

Two weeks later, Dr. Polifrone reported that Plaintiff had felt better from the injection, but that Plaintiff's range of motion remained limited.  AR 139.  On examination, Plaintiff had 90 degrees of abduction and 100 degrees of forward flexion.  Id.  Plaintiff reported to Dr. Polifrone that physical therapy had made her condition worsen.  Id.  Plaintiff exhibited generalized burning pain throughout the right upper extremity with some numbness and tingling.  Id.  Dr. Polifrone reported that there was no evidence of reflex sympathetic dystrophy, and she recommended to Plaintiff that she stop therapy.  Id.  Dr. Polifrone also authorized arthroscopic surgery.  Id.

On May 9, 2003, Plaintiff reported to Dr. Polifrone that she had continued significant right shoulder pain as well as neck and right elbow pain.  AR 137.  Plaintiff also reported a burning sensation anterior of the arm.  On examination, Dr. Polifrone reported that there was no superficial sensitivity nor discoloration or vascular indications of any reflex sympathetic dystrophy.  Id.  Dr. Polifrone did report that Plaintiff had significant subacromial pain, had pain in the impingement arc and right paracervical area with limited neck motion, had epicondylar

pain in the elbow, and had some intermittent numbness.  AR 137.  Dr. Polifrone noted that she believed that Plaintiff's major problem was her shoulder and that she needed to attack Plaintiff's pain at various joints.  Id.  Dr. Polifrone reported that Plaintiff was to be scheduled for arthroscopic subacromial decompression.  Id.

On May 28, 2003, Plaintiff was examined by Dr. Richard Semble in preparation for surgery.  AR 131.  Dr. Semble reported that Plaintiff had had chronic pain in the right shoulder subsequent to an accident on December 6, 2002, and that that pain was initially characterized as both neck and right shoulder pain.  Id.  Dr. Semble noted that Plaintiff had had multiple diagnostic studies, including x-rays and MRI scans, which showed a partial anterior surface tear of the supraspinatus tendon.  Id.  He also noted that Plaintiff had had physical therapy to no avail, and that Plaintiff had had pain in the right paracervical area with epicondylar pain in the elbow.  Id.  On examination, Plaintiff's cervical spine demonstrated right paracervical tenderness with limited neck motion, Plaintiff's right shoulder demonstrated exquisite sensitivity in the subacromial space, and Plaintiff had limited range of motion to about 90 degrees forward flexion and abduction.  Id.  Dr. Semble reported that Plaintiff had "subacromial tenderness," and that Plaintiff's right elbow demonstrated "medial and lateral epicondylar tenderness, full flexion, and extension normal strength."  Id.  He noted that Plaintiff had full wrist motion with good grip strength.  AR 131.  Dr. Semble diagnosed Plaintiff with a cervical sprain, subacromial bursitis in the right shoulder, and epicondylitis in the right elbow.  He admitted Plaintiff for arthroscopic subacromial decompression.  Id.

Plaintiff had outpatient surgery the following day.  AR 130.  An undated Nyack Hospital surgical pathology report noted that Plaintiff's diagnosis was "[r]ight shoulder: skeletal muscle, fibroadipose tissue, synovium and small fragments of bone."  Id. 132.  Plaintiff's preoperative

6

and postoperative diagnosis were right shoulder impingement syndrome.  Id.

On June 2, 2003, Plaintiff revisited Dr. Polifrone.  Dr. Polifrone reported that Plaintiff's wound was clean and dry, and that the stitches were removed.  AR 137.  On examination, Plaintiff's range of motion was slightly limited, but she had no abnormal swelling.  Id.  Dr. Polifrone recommended Plaintiff for aggressive range of motion exercises.  Id.  Later in June, Dr. Semble wrote a note on his letterhead, which was not addressed to any person or office, stating that Plaintiff had surgery on May 29, 2003, and that Plaintiff was "totally disabled from performing her work related activities." Id. 258.

Plaintiff returned to Dr. Polifrone where Plaintiff reported that she had been improving with therapy and that her night pain had been "clearly better." AR 136.  Dr. Polifrone noted that Plaintiff still had some deltoid pain, but that an x-ray of her shoulder showed a good decompression.  Id.  On August 7, 2003, while Plaintiff reported to Dr. Polifrone that the shoulder arthroscopy had provided her with some relief, she also reported that she had significant problems with her right paravertebral area.  Id. 135.  Plaintiff expressed that she had burning in the area extending into the upper trapezius, had limited shoulder motion, and had generalized achiness about the right elbow.  Id.  On examination, Plaintiff had full range of motion with normal strength, and she had some generalized tenderness.  Id.  Plaintiff declined an injection, and Dr. Polifrone prescribed Mobic to her.  Id.

On September 3, 2003, Plaintiff complained about her right shoulder and neck as well as her right parathoracic area.  AR 135.  Plaintiff specifically complained about pain in the distal part of her upper arm just above the lateral epicondyle.  Id.  Dr. Polifrone noted that she believed Plaintiff's pain was compensatory from Plaintiff's limited shoulder motion.  Id.  On examination, Plaintiff exhibited some generalized tenderness in her right paracervical area and parathoracic

area in the shoulders.  Id.  Dr. Polifrone recommended to Plaintiff that she take another month off of work and that she continue aggressive therapy.  Id.

Plaintiff returned to Dr. Polifrone on October 8, 2003, to report generalized right elbow pain mostly over the anterior aspect of the elbow and continued right paracervical spasm.  AR 134.  Plaintiff presented with no swelling, and she had full range of motion with normal strength.  Id. An x-ray of Plaintiff's cervical spine showed straightening.  Id.  Dr. Polifrone prescribed Skelaxin to Plaintiff.  Id.  A month later, MRI images of Plaintiff's cervical spine revealed minimal disc degeneration, but they revealed no fracture or disc herniation.  Id. 150.

On December 17, 2003, Plaintiff visited Dr. Polifrone's office for an evaluation of her ongoing pain.  AR 162-63.  Plaintiff complained of neck pain, pain on the right side of her head, right shoulder pain with decreased movement, pain in her right elbow, paresthesias of her right arm and hand, weak grip, and pain that awakened her at night.  Id.  On examination, Dr. Polifrone's impressions were "cervical sprain," "S/P arthroscopic surgery right shoulder for rotator cuff tear," "[a]dhesive capsulitis right shoulder," and "S/P [f]racture proximal radial head right elbow with evidence of median nerve neuropathy."  Id.  Dr. Polifrone requested authorization for "NCV/EMG studies" and an MRI of the right shoulder post-operative.  Id.  She prescribed Ultram and Lidocaine patches to Plaintiff.  Id.

Two weeks later, Plaintiff had an MRI of her right shoulder that resulted in a finding of an inflamed supraspinatus tendon and focal areas of thinning and irregularity consistent with a partial tear.  AR 168.  The tear did not appear to be "full thickness."  Id.  Also, there were prominent osteodegenerative changes involving the acromioclavicular joint and synovial hypertrophy present.  Id.  According to the report, the remainder of the MRI was unremarkable.  Id.

Plaintiff returned to Dr. Polifrone on January 22, 2004, where she complained that she had had continued pain.  AR 165.  An electrodiagnostic evaluation completed by Dr. Polifrone noted "median nerve neuropathy across the right elbow."  Id. 166.  Dr. Polifrone recommended to Plaintiff that she have an orthopedic re-evaluation of her shoulder.  Id. 165.

Throughout the remainder of 2004, Plaintiff sought treatment and/or consultative examination from Dr. Polifrone, Dr. Paul Brief, and Dr. Walter Nieves.  Following her January visit to Dr. Polifrone, Plaintiff sought examination from Dr. Brief on February 3, 2004.  On initial examination, Dr. Brief suggested an open repair of impingement as he believed Plaintiff's previous surgery was unsuccessful.  AR 209.  A day later, Dr. Brief requested authorization from Plaintiff's insurance carrier for open repair of right shoulder impingement.  Id. 249.  On March 2, 2004, Plaintiff reported to Dr. Brief that her right shoulder had been very painful, and that she had had a burning sensation over the posterior shoulder and arm as far as her forearm.  Id. 209.  On examination, Dr. Brief noted that Plaintiff's shoulder motion was poor, and that her elbow was tender.  Id.  X-rays of Plaintiff's right shoulder were essentially unchanged, and x-rays of Plaintiff's elbow showed no evidence of fracture.  Id.  Dr. Brief continued Plaintiff on her pain medication.  Id.  On March 26, 2004, Dr. Polifrone strongly advised Plaintiff that she should reconsider surgery for her shoulder as Dr. Polifrone believed that Plaintiff would not improve otherwise.  Id. 165.  A month later, Dr. Brief discussed Plaintiff's options with her, including whether Plaintiff wanted to proceed as she had been or wanted to seek open shoulder repair.  Id. 209.

On May 14, 2004, Plaintiff went for a neurologic consult with Dr. Nieves.  AR 146.  On physical examination, Dr. Nieves reported that Plaintiff was in no acute distress, and that she was not utilizing a cane, a collar or a corset.  Id. 148.  Plaintiff's neck revealed limitation of

range of motion with 30 degrees extension flexion and approximately 45 degrees lateral rotation

to the right and left with lateral flexion approximately 45 degrees to the right and left.  Id.

Plaintiff's chest was clear and her cardiac rhythm was regular.  Id.  Her extremities were without

edema or tenderness and no scars were appreciated.  Id.  Plaintiff's range of motion revealed that

she was unable to elevate her arm beyond approximately 45 degrees from the vertical.  Id.

Otherwise, Dr. Nieves reported that Plaintiff's range of motion was full in her elbow and wrist.

AR 148.  Dr. Nieves noted that Plaintiff had "marked right cervical tenderness in the C3-4, 5

range."  Id.  No thoracic or lumbar tenderness was noted.  Id.  On standing, Plaintiff was able to

bend forward fully and touch her knees.  Id.

On neurologic examination, Dr. Nieves noted that Plaintiff's mental status was awake,

alert and oriented.  AR 148.  On motor examination, Plaintiff revealed "4/5 strength except in the

right arm where due to pain of the right shoulder, limited affect was appreciated."  Id.  Her grasp

was 5/5 bilaterally.  Id.  On sensory examination, Plaintiff was intact to pin, touch, vibratory and

position sense in her upper and lower extremities.  Id.  Plaintiff's biceps were 2+ on the right and

2 on the left.  Id.  Her brachioradialis were 1 bilaterally, patellar jerks absent bilaterally, and

Babinski's were negative bilaterally.  Id.  Plaintiff's coordination was within normal limits on

"finger/finger" and "heel/shin/knee."  AR 148.  Dr. Nieves also reported that rapid alternating

movements were performed in Plaintiff's upper and lower extremities, and that fine finger

movements were well performed in Plaintiff's upper extremities.  Id.

Dr. Nieves concluded that Plaintiff had "[p]ost traumatic right shoulder injury associated

with partial rotator cuff tear."  AR 148-49.  He also noted that Plaintiff had "severe posttraumatic

cervical pain secondary to cervical strain which appear[ed] to be spreading and producing a

hyperalgesic state with referred pain and muscle spasm to the trapezius and a hyperalgesic state

10

of her right lower extremity." Id. 149.  Dr. Nieves believed that Plaintiff's headache was of a

posttraumatic origin on the basis of cervical spasm and pain.  Id.  He recommended that Plaintiff

repeat an MRI scan of her cervical spine, and he prescribed Elavil, Zanaflex and Orudis to

Plaintiff.  Id.  Dr. Nieves also reported that "surgical attention to [Plaintiff's] right shoulder

appear[ed] to be definitely warranted as it continue[d] to be a focus of pain and she appear[ed] to

have a surgically correctable lesion."  Id.

    Three days later, Dr. Michael Carlin reported based on his observations of Plaintiff's MRI

scan.  AR 170.  He reported "spondylotic changes within the cervical spine with a right-sided

uncovertebral spur at C3-C4, as well as bilateral uncovertebral spurs at C6-C7," "ossific ridging

with a component of a shallow broad-based disk herniation extending to the left at C5-C6, which

may be encroaching the proximal left neural foramen," "left paracentral disk herniation at T3-T4

level," and "an apparent aberrant right subclavian artery, felt to reflect a developmental

variation."  Id.

    Following her MRI, Plaintiff saw Dr. Polifrone twice in May and once in June, 2004,

where she complained that she had had continued pain.[1]  AR 191.  On June 1, 2004, Dr. Brief

again discussed the possibility of surgery with Plaintiff.  Id. 209.  On August 3, 2004, Dr. Brief

reported that Plaintiff was still reluctant to consider surgery, and on examination, Dr. Brief

suggested that Plaintiff's right shoulder was frozen.  Id. 209-10.  Dr. Brief reported that

Plaintiff's C spine showed involvement of disc levels C5-6-7, and he directed that Plaintiff seek a

---

[1] Progress notes reveal that Plaintiff also sought additional treatment in May, June, and July,
2004.  AR 155-61, 236-39.  However, progress notes for 5/19/2004, 6/10/2004, 6/14/2004,
6/22/2004, 6/30/2004, 7/08/2004, 7/15/2004, 7/22/2004, and 7/29/2004, do not contain a
physician's name.  The Administrative Record's Table of Contents notes only that these records
were obtained from Dr. Nieves's office.  There is no indication as to the name of the physician
who drafted the progress notes.

rehabilitation evaluation to address her frozen shoulder.  Id.  He also directed Plaintiff to return

to consider surgery.[2]  Id.  Plaintiff revisited Dr. Polifrone in August, 2004, through September

2005, where Plaintiff presented with the same symptoms she had had previously.[3]  Id. 191-94.

## 2.    Evidence from the State Agency Medical Consultant

On June 24, 2004, Plaintiff received a disability evaluation by Dr. William Lathan on

referral from the Division of Disability Determinations.  AR 171.  Dr. Lathan noted in his report

that he had had no prior doctor-patient relationship with Plaintiff.  Id. 173.  On examination, Dr.

Lathan reported that Plaintiff's cervical and lumbar spines showed full flexion, extension, lateral

flexion and full rotary movement bilaterally.  Id.  Plaintiff showed full range of motion of the left

shoulder, elbows, forearms and wrists bilaterally.  Id.  Plaintiff's right shoulder elevated actively

to a maximum of 80 degrees at which point Plaintiff complained of right shoulder joint pain.  Id.

Plaintiff showed full range of motion of the hips, knees and ankles bilaterally.  Id.  Dr. Lathan

reported Plaintiff's strength as 3/5 in the proximal right upper extremity, as 5/5 in the left upper

extremity, and as 5/5 in the bilateral lower extremities.  AR 173.  Dr. Lathan's impressions were

that Plaintiff had a history of right shoulder arthroscopy, had a history of right rotator cuff tear;

and had a history of hypertension.  Id.  Under "medical source statement," Dr. Lathan reported

---

[2] It is unclear from the medical records whether or not Plaintiff returned to see Dr. Brief subsequent to this visit.

[3] Progress notes reveal that Plaintiff sought physical therapy treatment for her right shoulder between September, 2004, and March, 2005.  AR 202-07.  However, while progress notes for 9/28/2004, 9/30/2004, 10/07/2004, 10/14/2004, 10/28/2004, 11/04/2004, 11/09/2004, 11/16/2004, 11/18/2004, 1/18/2005, 1/20/2005, 1/25/2005, 1/27/2005, 2/01/2005, 2/04/2005, 2/08/2005, 2/17/2005, 2/22/2005, and 3/10/2005, contain a physician's signature, the Court cannot determine that name.  The Administrative Record's Table of Contents notes only that these records were obtained from Dr. Polifrone's office.  There is no indication as to the name of the physician who drafted the progress notes.

that there was "a severe restriction for activities requiring lifting, carrying, pushing, pulling and overhead reaching with the right upper extremity." Id.

In an undated Physical Residual Functional Capacity Assessment, G. Casale, a state agency disability analyst, reported that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and that Plaintiff was limited as far as pushing and/or pulling in her upper extremities. AR 178. In support of these conclusions, the assessment referred to an Electronic Request for Medical Advice that was signed by Dr. Donna White on September 9, 2004. Id.

On September 9, 2004, Dr. White, a state agency medical consultant, opined as to Plaintiff's residual functional capacity.[4] AR 176. Dr. White described Plaintiff as 51 years old with a history of injury to her right elbow and her right shoulder with pain extending into the right side of her neck. Id. Dr. White added that Plaintiff had undergone right shoulder arthroscopy and subacromial decompression, and that a February 2, 2004, orthopedic evaluation had suggested open repair to her right shoulder due to impingement and ACJ osteoarthritis. Id. Dr. White noted that Plaintiff's course and prognosis had been complicated by electrodiagnostically confirmed median nerve neuropathy across her right elbow. Id. She assessed Plaintiff's residual functional capacity as Plaintiff having the ability to lift 20 pounds with her left upper extremity, carry 10 pounds with her left upper extremity, lift and carry under 10 pounds with her right upper extremity, stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. Dr. White also assessed Plaintiff as

---

[4] It is unclear from the Electronic Request for Medical Advice whether or not Dr. White physically examined Plaintiff as the report only referenced a review of records. AR 176.

not having the ability to climb ladders, ropes or scaffolds, to crawl, and to push, pull, or reach with her right upper extremity.  She also reported that Plaintiff could only occasionally "handl[e]" with her right upper extremity.  Id.

The undated assessment signed by Casale that referred to Dr. White's opinion further provided that Plaintiff was limited manipulatively in "reaching all direction (including overhead)," "handling (gross manipulation)," and "fingering (fine manipulation)."  AR 179.  The assessment noted that these limitations were with respect to Plaintiff's right upper extremity secondary to injury.  Id.  The assessment also noted that Plaintiff had no visual, communicative, or environmental limitations.  Id. 179-80.  Casale opined that Plaintiff's allegations as to her functional limitations, including Plaintiff's allegations that she had difficulty lifting, standing, walking, sitting, climbing, kneeling and/or squatting, were partially credible.  Id. 180.  The assessment reported that there were no treating/examining source conclusions about Plaintiff's limitations or restrictions that were significantly different from Casale's findings, and Casale noted Dr. Lathan's reference to "severe restrictions for activities requiring lifting, carrying, pushing/pulling, and overhead reaching with right arm."  Id. 181.

C.   **Other Evidence**

1.   **Evidence from Disability Records**

On May 25, 2004, N. Kitay completed a disability report after interviewing Plaintiff.  AR 73 - 75.  Plaintiff's interview was conducted in person, and Kitay reported that Plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, and/or writing.  Id. 74.  Kitay also noted that Plaintiff was pleasant, neatly attired, and groomed.  Id.  Plaintiff "walked slowly but showed no overt problems."  Id.  Plaintiff "answered all questions with no difficulty."  Id.  Kitay noted no other

problems.  Id.

An unsigned disability report that appears to have been completed by Plaintiff, and that was generated three days after the interview with Kitay, stated that Plaintiff's right arm, shoulder, neck and elbow problems, and her high blood pressure limited her ability to work.  AR 66.  Plaintiff stated that she "c[ould] not lift or do anything," and that she was in constant pain.  Id.  The report provided that Plaintiff was unable to work because of her injuries beginning on December 6, 2002.  Id. 67.  Plaintiff stated that she had "tried to go back to work a little while after [her] accident but [she] only lasted 2 weeks."  Id.  Plaintiff reported that prior to her being unable to work, she had been a developmental aid at a group home earning $34,000.00 per year, and that she had been working eight hours per day, five days a week.  Id.  Plaintiff stated that she had completed the twelfth grade in 1974, and that she had received special job training as a home health aid in 1982.  Id. 71.  As a developmental aide, Plaintiff reported that her duties had included taking care of patients, showering them, taking them out and grooming them.[5]  AR 67.  Plaintiff stated that each day on the job she had spent three hours walking, four hours standing, one hour sitting, one hour climbing, three hours stooping, one hour kneeling, two hours crouching, no hours crawling, five hours handling, grabbing or grasping big objects, two hours reaching and one hour writing, typing or handling small objects.[6] [7]  Id. 68.  With respect to lifting

---

[5] Similarly, in an August 30, 2004, functional report that was signed by Plaintiff, when describing her work as a developmental aide, Plaintiff reported that she had "lifted patients out of bed into [sic] wheelchair," "showered patients," "dressed them," and "cooked food for them."  AR 88.

[6] The Court notes that these hours total a 23 hour workday.  The Court assumes these numbers to be estimates or that certain activities were performed simultaneously.

[7] Three months later, in the August 30, 2004, functional report, Plaintiff provided a different calculation as to the number of hours she had spent doing certain activities while on the job.  She

and carrying, Plaintiff stated that she had "lifted patients in and out of bed" and had "carried shopping items to and from [the] supermarket." Id. She stated that the heaviest weight she had lifted on the job had been 100 pounds or more, and that she had frequently lifted 50 pounds or more.[8] Id. Plaintiff reported that she had supervised four people at her job, and that 100% of her job had been spent supervising.[9] Id. With respect to her injuries, Plaintiff stated in the disability report that she was, at the time, taking Darvocit and using Lidoderm patches, prescribed by Dr. Polifrone for pain, and Zanaflex, prescribed by Dr. Nieves for muscle relaxation. Id. 70. It was reported that Plaintiff had had an MRI/CT scan of her right shoulder and neck in January 2003, and another MRI/CT scan of her shoulder and neck in December 2003. AR 71.

In the August 30, 2004, "functional report," Plaintiff reported that she was living with her family. AR 76. She stated that her normal routine from the time she woke up to the time she went to bed was to eat breakfast, take medication, watch television, take a shower, go to the doctor, eat lunch, take a nap, take medication, eat dinner, watch television, and go to sleep. Id. 77. She stated that prior to her injury she had been able to do "everything," and subsequent to her injury she was able to do nothing. Id. 77, 81. She reported that her pain was waking her up from her sleep. Id. 77. Plaintiff stated that she did not need assistance with her personal needs

_____

stated that each day she had been on the job she had spent seven hours walking, seven hours standing, half an hour sitting, two to three hours climbing, no hours stooping, two hours kneeling, two hours crouching, six hours handling, grabbing or grasping big objects, and one hour writing, typing or handling small objects. AR 88. The Court notes that these hours exceed a 24-hour day. The Court assumes these numbers to be estimates or that certain activities were performed simultaneously.

[8] In the August 30, 2004, functional report, Plaintiff stated that the heaviest weight she had lifted on the job was over 100 pounds and that she had frequently lifted over 100 pounds. AR 88.

[9] Oddly, in the August 30, 2004, functional report, Plaintiff stated that she had not supervised any one at her job. AR 88.

16

or her grooming, but that her daughter cooked meals and shopped because Plaintiff could not stand for too long nor could she bend.  Id. 78, 80.  She reported that she could not do house or yard work because she could not stand for too long, she could not bend, and she had trouble lifting.  Id. 79.  She reported that she could drive a car only a short distance to go to the doctor.  AR 79.  Plaintiff also reported that she had had problems walking too far, sitting for too long, climbing stairs, kneeling, squatting, and reaching.  Id. 81.  She stated that she could walk a half of a block before needing to rest for thirty minutes.  Id. 82.

In that same report, Plaintiff stated that she first had her pain on December 6, 2002, and that the pain had begun affecting her activities that same day.  AR 84.  She stated that the pain felt like a stabbing and burning pain, and that she felt the pain in her neck, right shoulder and right side extending down to her feet.  Id.  Plaintiff stated that she was right-handed.  Id. 81.  She reported that the pain had gotten worse since it started, that she had the pain "all the time," and that "anything" brought on the pain.  Id. 85.  Plaintiff stated that medication had relieved the pain for a short time.  Id.  In answering what, if any, activities she participated in, Plaintiff stated that she "walk[ed] a little bit" and "d[id] exercises."[10]  Id. 86.

In a signed but undated report entitled "Disability Report - Appeal," Plaintiff stated that since she had last completed a disability report, her pain had worsened.  AR 95, 99.  She reported that, at the time of completing the report entitled "Disability Report - Appeal," she had no new physical or mental limitations as a result of her injuries.  Id. 95.  She also reported that she remained unable to do "anything."  Id. 99.

---

[10] While Plaintiff did not specify the type of exercises she participated in, the statement that she "d[id] exercises" contradicts her previous statement that she was able to do nothing.  See AR 77, 81, 86.

17

2.      **Evidence from the March 8, 2006, Hearing**

At the time of Plaintiff's hearing before ALJ Lemoine on March 8, 2006, Plaintiff

testified that she had been born in Haiti on October 20, 1952, that she had "twelve, fourteen

years together" of schooling, and that she had obtained a "certification for nurse's aide."  AR

267-68.  Plaintiff testified that she lived with her thirty-one year old daughter and her fourteen

year old son.  Id. 268.  She stated that December 6, 2002, was the last date that she had worked,

and that prior to her stoppage, she had worked for eighteen years taking care of mentally

handicapped patients as an aide.  Id. 269.  In describing her duties, she testified that she had

showered her patients, lifted them up, put them to bed, fixed their beds, cooked for them, and

transported them to work and to recreational activities.  Id. 270.  She testified that her patients

had weighed "175, some of them were 200."  Id.  Plaintiff testified that her injuries had been

caused by slipping and falling on her right side while she had been working.  Id.  She stated that

she had injured her elbow, shoulder, and neck on her right side.  AR 270.  She testified that she

had attempted to go back to work a few months later but that she had been unable to do so.  Id.

271.

Plaintiff also testified that she had received an operation in 2003, for the injury she had

had to her right shoulder and her right elbow.  AR 271.  She testified that after the operation, she

had had the same problems so she had visited another doctor who said that she needed another

surgery.  Id. 272.  She testified that she had decided against getting the second surgery.  Id.  As

far as her limitations, Plaintiff testified that she had pain all day, that she could not do anything,

and that the pain extended down her whole right side.  Id. 273, 274.  She testified that she could

pick up a pen, but nothing heavy.  Id. 274.  She testified that she was unable to go anywhere by

herself because she had a lot of pain and got tired.  Id. 276.  She testified that following the

18

surgery, she had started having pain in her right leg.  AR 278.  Plaintiff testified that she could

stand for ten to fifteen minutes and walk about a block, but that she was unable to lift anything

with her hands.  Id.  She also testified that she had difficulty sleeping at night because of her

pain.  Id.

A vocational expert, Donald Slive, testified at the hearing.  Mr. Slive testified that

Plaintiff's job as a developmental aide had a SVP of 3,[11] had required medium physical demand,

was semiskilled, and had a DOT code of 354.374-010.  AR 287.  He testified that he could not

identify transferable skills.  Id.  The ALJ then posed a hypothetical to the expert presuming that a

person was of Plaintiff's age, education and history.  Id.  The ALJ asked that if that person could

occasionally lift up to 20 pounds with the left upper extremity, frequently lift up to 10 pounds

with the left upper extremity, lift less than 10 pounds either frequently or occasionally with the

right major upper extremity, sit up to six hours a workday, stand and walk up to six hours a

workday, and would be limited to no more than occasional overhead reaching with the right

major upper extremity and no more than occasional gross or fine manipulation with that same

extremity, could a person do any of Plaintiff's past relevant work.  Id. 287-88.  The vocational

expert responded that a person could not.  Id. 288.

The expert testified that "the lack of bilateral dexterity does narrow the base, but there are

job[s] such as escort."  AR 288.  Mr. Slive testified that an escort, with a DOT code of 353.667-

010, has a light physical demand and is unskilled.  Id.  Mr. Slive also testified that there were

---

[11] "SVP" stands for "specific vocational preparation," which is defined as "the amount of lapsed
time required by a typical worker to learn the techniques, acquire the information, and develop
the facility needed for average performance in a specific job-worker situation."  Dictionary of
Occupational Titles, Appendix C.  An SVP of 3 means "over 1 month up to and including 3
months"  Id.

7,400 of these jobs in the national economy and 533 within the region.  Id.  He testified that

another job a person could perform with the stated limitations was surveillance system monitor,

with a DOT code of 379.367-010, requiring a sedentary physical demand and unskilled work.

Mr. Slive testified that there were 16,370 of these jobs in the national economy and 1,225 within

the region.  Id.

The ALJ then rephrased a hypothetical posed by Plaintiff's attorney, asking the expert to

presume the limitation of no use at all of the right upper extremity.  AR 290.  The ALJ asked that

if assuming that limitation, would the expert's answer change with respect to available jobs.  Id.

The expert responded that it would not change his answer.  Id.  The ALJ then asked, "even if she

was completely unable to use that one arm," that "those jobs would still be there?"  Id. 290-91.

The expert responded "yes," and that he "chose jobs that a person could perform with one arm."

Id. 291.

Lastly, the ALJ rephrased a final hypothetical posed by Plaintiff's attorney, asking the

expert to presume that because of chronic pain and medication "she would require frequent

breaks during an eight-hour-workday – more than the standard breaks – would she still be able to

do other work?"  AR 291.  The expert responded that "under that RFC" he could not identify any

job in the national economy or regional economy that a person could perform.  Id.

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   Standard of Review

The scope of review in an appeal from a social security disability determination involves

two levels of inquiry.  First, the court must review the Commissioner's decision to determine

whether the Commissioner applied the correct legal standard when determining that the plaintiff

was not disabled.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Failure to apply the

correct legal standard is grounds for reversal of the ruling.  <u>Townley v. Heckler</u>, 748 F.2d 109, 112 (2d Cir. 1984).  Second, the court must decide whether the Commissioner's decision was supported by substantial evidence.  <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 105-06 (2d Cir. 2003).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Id.</u> at 106 (internal quotation marks and citations omitted). When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides."  <u>Tejada</u>, 167 F.3d at 774 (citing <u>Quinones v. Chater</u>, 117 F.3d 29, 33 (2d Cir. 1997)).  "It is not the function of a reviewing court to decide <u>de novo</u> whether a claimant was disabled." <u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).  If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner."  <u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002).  Moreover, the ALJ "has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."  <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

**B.**   **<u>Determining Disability</u>**

In the context of disability benefits, the Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). In evaluating a disability claim, regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow.  <u>See</u> 20 C.F.R. § 404.1520(a)(4).

First, the Commissioner will consider whether the claimant is working in "substantial

gainful activity." <u>Id.</u> at § 404.1520(a)(4)(i),(b).  If the claimant is engaged in "substantial gainful activity," then the Commissioner will find that the claimant is not disabled.  <u>Id.</u>  Second, the Commissioner considers the medical severity of the claimant's impairments.  <u>Id.</u> at § 404.1520(a)(4)(ii).  The claimant's impairment will not be deemed severe "[i]f [he or she] do[es] not have any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities."  <u>Id.</u> at § 404.1520©.  Third, if it is found that the claimant's impairments are severe, the Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, listed in Appendix 1 to Part 404, Subpart P of the Social Security Regulations.  <u>See</u> <u>id.</u> at § 404.1520(a)(4)(iii),(d).  If the claimant's impairments are not on the list, the Commissioner considers all the relevant medical and other evidence and decides the claimant's residual functional capacity.  <u>See id.</u> at § 404.1520(e).  Then, the Commissioner proceeds to the fourth step to determine whether the claimant can do his or her past relevant work.  <u>See id.</u> at § 404.1520(a)(4)(iv),(e)-(f).  Finally, if it is found that the claimant cannot do his or her past relevant work, the Commissioner will consider the claimant's residual functional capacity, age, education, and work experience to see if he or she can make an adjustment to other work.  <u>See</u> <u>id.</u> at § 404.1520(a)(4)(v),(g).

The claimant bears the burden of proof on the first four steps of this analysis.  <u>DeChirico</u> <u>v. Callahan</u>, 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted).  If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps.  <u>Williams v. Apfel</u>, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work.  <u>DeChirico</u>, 134 F.3d at 1180 (citation omitted).

III.    **DISCUSSION**

In deciding Plaintiff's case, the ALJ applied the required five-step sequential analysis set forth in the regulations.  First, the ALJ found that Plaintiff had not engaged in "disqualifying substantial gainful activity since the alleged onset of disability."  AR 13, 19.  The ALJ found that Plaintiff's "[e]arnings posted in 2004 constitute[d] an 'unsuccessful work attempt.'"  Id. 19.  Second, he found that the medical evidence established that Plaintiff suffered from impingement syndrome and chronic bursitis of the right shoulder, status-post decompression, epicondylitis of the right elbow, and multi-level spurs of the cervical spine with a disc herniation at C5-C6.  Id. 13, 19.  The ALJ found that these impairments were "severe" within the meaning of the Social Security Regulations.  Id.  The ALJ also found that the medical evidence established that Plaintiff suffered from hypertension, "which appear[ed] to be well-controlled with medication."  Id.  Third, the ALJ found that while Plaintiff' impairments were "severe" within the meaning of the regulations, "they [were] not accompanied by the specific medical findings that meet or equal the criteria of any of the impairments" listed in Appendix 1 to Subpart P of Part 404 of the Social Security Regulations.  Id.  Therefore, the ALJ went on to determine Plaintiff's residual functional capacity and concluded that Plaintiff "ha[d] the residual functional capacity to lift/carry objects weighing up to 10 pounds frequently and up to 20 pounds occasionally with her left upper extremity; she [could] lift/carry objects weighing less than 10 pounds with the right upper extremity; she [could not] use her right upper extremity for more than occasional handling, overhead reaching or for fine or gross manipulative activities; and she [could] sit/stand/walk for up to six hours in an average 8-hour workday."  AR 19.

At the fourth step in the analysis, the ALJ credited the vocational expert's testimony and found that Plaintiff was unable to return to her past relevant work.  AR 17, 19.  The ALJ found

that Plaintiff did, however, have the residual functional capacity to "perform a significant range of light work."  Id. 20.  At the fifth step in the analysis, the ALJ again credited the vocational expert's testimony and used the medical vocational guidelines (the "grids") contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, taking into account Plaintiff's residual functional capacity, age, education, and work experience.  Id. 19-20.  The ALJ found that Plaintiff was "an individual closely approaching advanced age" with "more than a high school education." Id. 19.  He also found that Plaintiff had "semiskilled work experience and no transferable skills from any past relevant work." Id. 20.  The ALJ found that although Plaintiff's exertional limitations did not allow her to perform the full range of light work, there were a significant number of jobs in the national economy that she could perform, such as an escort and surveillance system monitor.  Id. 18, 20.  Consequently, the ALJ determined that Plaintiff was not under a disability within the meaning of the Act at any time through the date of his decision.  AR 20.  He concluded that Plaintiff was not entitled to a period of disability or disability insurance benefits under the Act.  Id.

    In her motion papers, Plaintiff contends that the Commissioner failed to use the proper legal standards in evaluating the evidence.  See Plaintiff's Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings.  Specifically, Plaintiff contends that the Commissioner failed to give proper weight to Plaintiff's treating physicians; failed to properly consider Plaintiff's symptoms; failed to properly consider the Listing of Impairments in Appendix 1, Subpart P of Part 404 of the Social Security Regulations; and failed to properly consider the definition of light work.  See id.  Thus, Plaintiff asks this Court to find that she is entitled to disability benefits.  Id.  The Commissioner moves for judgment on the pleadings, contending that the ALJ's decision is supported by substantial evidence.  Docket # 11.

24

A.      **The Medical Opinion Evidence**

Under the Social Security regulations, a treating physician's opinion regarding the nature and severity of a claimant's impairments will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(2); Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995).  If a treating physician's opinion is not given controlling weight, then various factors are applied in determining what weight to give it: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the extent to which the medical source provides relevant evidence to support an opinion; (iv) the extent to which the opinion is consistent with the record as a whole; (v) whether the opinion is given by a specialist; and (vi) other factors which may be brought to the attention of the ALJ.  Id. at § 404.1527(d)(2)(i)-(ii), (d)(3)-(d)(6).  The Commissioner "will always give good reasons in [his or her] notice of determination or decision for the weight [he or she] give[s] [a claimant's] treating source's opinion."  Id. at § 404.1527(d)(2).  "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  Certain findings, however, such as whether a claimant is disabled and cannot work, are reserved to the Commissioner.  20 C.F.R. § 404.1527(e)(1).  In other words, "a treating physician's statement that the claimant is disabled cannot itself be determinative."  Snell, 177 F.3d at 133.

Here, Plaintiff argues that the ALJ failed to give proper weight to the opinion of her treating physicians.  Plaintiff specifically argues that the ALJ's decision omits consideration of Dr. Semble's and Dr. Polifrone's opinions regarding Plaintiff's impairments to her right shoulder, right elbow and cervical spine.  However, Dr. Semble's and Dr. Polifrone's findings were

credited by the ALJ in his decision and their opinions, if any, were provided proper weight.

Plaintiff sought consultation with Dr. Semble on May 28, 2003, at which time Dr. Semble

examined Plaintiff and diagnosed her with a cervical sprain, subacromial bursitis in the right

shoulder, and epicondylitis in the right elbow.  AR 131.  Dr. Semble admitted Plaintiff for

arthroscopic subacromial decompression, and Plaintiff received that surgery the following day.

AR 130-31.  Dr. Semble's findings were in no way inconsistent with the findings of the ALJ.  In

fact, the ALJ specifically credited Dr. Semble's findings in his decision, noting that Plaintiff had

"impingement syndrome and chronic bursitis of the right shoulder, status-post decompression;

epicondylitis of the right elbow; [and] multi-level spurs of the cervical spine with a disc

herniation at C5-C6."  Id. 13.  Even Dr. Semble's June, 2003, letterhead notation that Plaintiff

"was totally disabled from performing her work related activities" was not inconsistent with the

ALJ's findings as the ALJ also found that Plaintiff was unable to perform her past relevant work.

Id. 19.  Even if Dr. Semble had found that Plaintiff was totally disabled from performing *any*

type of work, to which there is no indication in the medical records, the ALJ was under no

obligation to reach that same ultimate conclusion, as the finding as to whether Plaintiff is

disabled is a decision reserved to the Commissioner.  20 C.F.R. § 404.1527(e)(1); Snell, 177

F.3d at 133.

      Regarding Dr. Polifrone, Plaintiff sought treatment from Dr. Polifrone on a consistent

basis, beginning in December, 2002, as a result of feeling pain in numerous areas of her body,

including her right shoulder, right elbow, and neck.  Dr. Polifrone initially provided Plaintiff

with a sling for her right arm, and she instructed that Plaintiff seek physical therapy for her

injuries.  AR 143.  Plaintiff continued reporting pain, whereby Dr. Polifrone began what appears

to be a series of injections.  Id. 140.  As a result of sustained limited range of motion in

26

Plaintiff's right shoulder and reports of continued pain, Dr. Polifrone authorized Plaintiff for arthroscopic surgery.  Id. 139.  Dr. Polifrone noted that she believed that Plaintiff's major problem was her shoulder.  Id. 137.  As noted by the ALJ, following surgery, Plaintiff reported to Dr. Polifrone that she was improving with therapy, and on examination, Plaintiff had full range of motion.  Id. 135-36.  Subsequent to the initial improvement, Plaintiff reported continued pain in her right shoulder and neck, which Dr. Polifrone attributed to being compensatory from Plaintiff's limited shoulder motion.  Id. 135.  Dr. Polifrone eventually recommended that Plaintiff have an orthopaedic re-evaluation of her shoulder.  AR 165.  While Dr. Polifrone noted Plaintiff's subjective complaints of pain and her prescribed treatment and findings in her progress notes, Dr. Polifrone did not provide an opinion regarding Plaintiff's functional capacity. Moreover, while the ALJ found that Plaintiff's own allegations regarding her limitations and her subjective complaints of pain were not totally credible, there is nothing in the ALJ's decision to suggest that the ALJ discredited Dr. Polifrone's findings.

Oddly, Plaintiff also argues that the ALJ credited the opinion of Dr. Lathan, a state agency consultant, but that Dr. Lathan's examination "is old under the circumstances."  Dr. Lathan's opinion was, in fact, favorable to Plaintiff in that he opined that Plaintiff had " 'severe' restrictions for activities requiring carrying, pushing, pulling and overhead reaching with the right upper extremity."  AR 16.  In his decision, the ALJ clearly stated that he incorporated Dr. Lathan's opinion into his decision with respect to Plaintiff's residual functional capacity.  Id.

### B.    The Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ erred by not properly considering her subjective complaints of pain and other symptoms.  However, an ALJ's credibility findings are entitled to deference by a reviewing court.  See Tejada, 167 F.3d at 775-76 (upholding ALJ's credibility determination,

citing with approval <u>Pascariello v. Heckler</u>, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985), in which the district court noted "that after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, the ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment."); <u>see also</u> <u>Aponte v. Sec'y, Dep't of Health & Human Servs.</u>, 728 F.2d 588, 591 (2d Cir. 1984)("It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.  If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.")(internal quotation marks and citation omitted).  In rendering his decision in this case, the ALJ carefully considered all of Plaintiff's subjective complaints concerning her physical limitations, giving detailed reasons why he believed they were not entitled to great weight, and such findings are supported by substantial evidence in the record.  <u>See</u> AR 15-16.  Consequently, there is no basis to disturb these findings.

Further, had Plaintiff followed the recommendation of her treating physicians, her pain may have lessened or stopped.  As the ALJ noted in his decision, Plaintiff declined any open surgery after her unsuccessful arthroscopic procedure.  AR 14, 16.  No fewer than three of Plaintiff's own physicians, on multiple occasions, recommended that Plaintiff have open repair of her right shoulder impingement.  February 3, 2004, was the first date that Dr. Brief suggested that Plaintiff should seek additional, different surgery, as the previous procedure was unsuccessful.  <u>Id.</u> 209.  Dr. Polifrone strongly advised Plaintiff on March 26, 2004, that she should reconsider surgery for her shoulder as Dr. Polifrone believed that Plaintiff would not improve otherwise.  <u>Id.</u> 165.  On May 14, 2004, Dr. Nieves reported that surgical attention to Plaintiff's right shoulder was "definitely warranted," and that Plaintiff appeared to have a

28

surgically correctable lesion. Id. 149. While these recommendations may not constitute

"prescribed treatment" for purposes of a 20 C.F.R. § 404.1530 analysis,[12] Plaintiff's subjective

complaints of pain may have diminished had she followed the advice of her physicians.

### C.    The Listing of Impairments

Plaintiff argues that the ALJ did not properly consider the listing of impairments, and that

Plaintiff's right elbow injury alone should have resulted in a finding of "disabled" based on

Listing of Impairment 1.12.[13] Sections 1.07 and 1.08 provide categories of musculoskeletal

impairments. Pursuant to Section 1.07, to qualify as an impairment, the claimant must have a

"[f]racture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius,

or ulna, under continuing surgical management, as defined in 1.00M,[14] directed toward

restoration of functional use of the extremity, and such function was not restored or expected to

be restored within 12 months of onset." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.07.

Pursuant to Section 1.08, to qualify as an impairment, the claimant must have a "[s]oft tissue

---

[12] 20 C.F.R. §404.1530 provides that "[i]n order to get benefits, [a claimant] must follow treatment prescribed by [the claimant's] physician if this treatment can restore [the claimant's] ability to work." 20 C.F.R. §404.1530(a). When a claimant does not follow prescribed treatment without a good reason, as set forth in 20 C.F.R. §404.1530(c)(1)-(5), the Commissioner will not find the claimant disabled or will stop paying the claimant benefits if the claimant is already receiving benefits. 20 C.F.R. §404.1530(b).

[13] As the Commissioner correctly footnotes in his reply papers, Plaintiff's citation to "Listing of Impairment 1.12" is long outdated. Effective February 19, 2002, the conditions set forth in the section previously referred to as "1.12" were thereafter set forth in sections "1.07" and "1.08" of the Listing of Impairments. See 66 Fed. Reg. 58010, 58040 (Nov. 19, 2001). Plaintiff's argument that her right elbow injury alone should have resulted in a finding of "disabled" under Listing of Impairment section 1.12 is discussed herein pursuant to sections 1.07 and 1.08.

[14] According to the regulations, "under continuing surgical management" refers to "surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part." 20 C.F.R. Part 404, Subpart P, Appendix 1 §1.00M.

injury (e.g., burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.08.

There is nothing in the record to suggest that Plaintiff suffered a soft tissue injury, and Plaintiff focuses on an x-ray finding that she sustained a fracture of the radial head of her right elbow to suggest that the ALJ should have found her disabled pursuant to Section 1.07. That finding was made by Dr. Polifrone on December 11, 2002, where she reported that an x-ray showed a fracture of the radial head in satisfactory alignment. AR 143. Dr. Polifrone prescribed sling immobilization. Id. A month later, Dr. Polifrone reported that Plaintiff had gained an increased range of motion of the right elbow. Id. 142. She also reported that an x-ray of Plaintiff's elbow showed satisfactory alignment. Id. At the next visit, Dr. Polifrone noted that an x-ray of Plaintiff's elbow showed some small calcific deposits. Id. 141. On May 9, 2003, Dr. Polifrone reported that she believed that Plaintiff's major problem was her shoulder, and that she needed to attack the shoulder pain at various joints. Id. 137. Later in May, 2003, Dr. Semble reported that Plaintiff's right elbow demonstrated "medial and lateral epicondylar tenderness, full flexion, and extension normal strength." AR 131. Dr. Semble diagnosed Plaintiff with, among other things, epicondylitis[15] in the right elbow. Id. In an August 7, 2003, visit with Dr. Polifrone, Plaintiff had full range of motion with normal strength. Id. 135. On September 3, 2003, Dr. Polifrone noted that she believed Plaintiff's pain was compensatory from Plaintiff's

---

[15] Lateral epicondylitis is commonly referred to as "tennis elbow" and medial epicondylitis is commonly referred to as "golfer's elbow." National Institutes of Health, National Institute of Arthritis and Musculoskeletal and Skin Diseases, NIH Publication No. 11-6240, http://www.niams.nih.gov/Health_Info/Bursitis/default.asp#3_1 (last visited Mar. 24, 2011).

limited shoulder motion.  Id.  On October 8, 2003, Plaintiff presented to Dr. Polifrone no

swelling, and Plaintiff had full range of motion with normal strength.  Id. 134.  On December 17,

2003, Dr. Polifrone noted that Plaintiff's fracture to the proximal radial head of her right elbow

was a previous condition, reporting "S/P [f]racture proximal radial head right elbow with

evidence of median nerve neuropathy."  Id. 162-63.  In an electrodiagnostic evaluation

completed about a month later by Dr. Polifrone, she noted "median nerve neuropathy across the

right elbow."  AR 166.  On March 2, 2004, x-rays of Plaintiff's elbow showed Dr. Brief that

there was no evidence of fracture.  Id. 209.  On May 14, 2004, Dr. Nieves reported that

Plaintiff's range of motion was full in her elbow and wrist.  Id. 148.

There is no support in the medical records evidencing that Plaintiff's fracture to the radial

head of her right elbow failed to heal.  While the initial x-ray revealed that Plaintiff suffered the

fracture, subsequent x-rays revealed no evidence of fracture and revealed satisfactory alignment.

Additionally, Dr. Polifrone and Dr. Nieves reported that Plaintiff had had full range of motion in

her elbow.  Taking the objective medical evidence with respect to only the elbow injury, Plaintiff

failed to qualify as having an impairment for purposes of Section 1.07.

Nevertheless, the ALJ did not limit his consideration to only the right elbow injury when

determining whether Plaintiff was disabled under the listing of impairments.  The ALJ footnoted

in his decision that he considered all of Plaintiff's injuries, including Plaintiff's complaints of

neck, shoulder and right arm pain, as well as her hypertension, when examining the Listing of

Impairments, and he found that while Plaintiff's impairments were "severe" within the meaning

of the regulations, "they [were] not accompanied by the specific medical findings that meet or

equal the criteria of any of the impairments" listed in the regulations.  AR 13 fn 1.  There is

nothing in the record to establish that the ALJ improperly considered the criteria when

determining whether Plaintiff's injuries qualified as an impairment in the Listing of Impairments. Thus, there is no reason to disturb the ALJ's finding.

### D.   The Assessment of Plaintiff's Residual Functional Capacity

Plaintiff argues that the ALJ "used his own definition of light work," and that Plaintiff does not have the residual functional capacity to perform the full range of light work.  Plaintiff also argues that because she had been unable to perform a full range of light work, a finding of "disabled" had been warranted.  Contrary to Plaintiff's argument, the definition of light work used by the ALJ in his decision is the definition of light work provided for in the regulations. Further, Plaintiff's argument supposes that the ALJ found that Plaintiff could perform the full range of light work, when, in fact, that was not the ALJ's finding.  Rather, the ALJ found that Plaintiff could perform a significant range of light work, which is why the ALJ heard testimony from a vocational expert as to jobs in the national economy that Plaintiff could perform, if any, with her residual functional capacity.

Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).[16]  Further, "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.  The regulations provide that, "[t]o be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do

---

[16] The Social Security Administration has further explained that " '[f]requent' means occurring from one-third to two-thirds of the time.  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping."  SSR 83-10, 1983 WL 31251, at *6 (S.S.A. 1983).

substantially all of these activities.  If someone can do light work, [the Commissioner] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  Id.; 20 C.F.R. Part 404, App. 2 Rule 202.00 ("[t]he functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work.").

There is substantial evidence in the record supporting the ALJ's assessment as to Plaintiff's residual functional capacity.  The ALJ found that Plaintiff had the residual functional capacity to "lift/carry objects weighing less than 10 pounds with the right upper extremity, up to 10 pounds frequently and up to 20 pounds occasionally with her left upper extremity; and she can sit/stand/walk for up to six hours in an average 8-hour workday."  AR 16.  The ALJ also found that Plaintiff "[could not] use her right upper extremity for more than occasional handling, overhead reaching or for activities requiring fine or gross manipulation," concluding that that residual functional capacity allows for Plaintiff to perform a significant range of light work.[17]  Id. 16, 20.  The ALJ reached this finding based on the opinions of Dr. Lathan and Dr. White.  Id. 16. As the ALJ pointed out, "the record does not contain any opinions from any of [Plaintiff's] treating physicians that she has any current restrictions greater than the finding of RFC" within the ALJ's decision.  Id.

The ALJ even went on to find that Plaintiff's ability to perform all or substantially all of the requirements of light work was "impeded by additional exertional and/or non-exertional limitations."  AR 18.  As a result, the ALJ heard from the vocational expert who testified that based on Plaintiff's residual functional capacity assessment, Plaintiff was unable to return to her

---

[17] There is nothing in the medical evidence to suggest that Plaintiff had limited use of her *left* extremity.

past relevant work.  Id. 17.

At the fifth step in the sequential analysis, because the ALJ found that Plaintiff was reduced to performing a significant range of light work, rather than having had the ability to perform the full range of light work, he was unable to direct a finding of "not disabled" based solely on the grids.  The ALJ appropriately elicited the testimony of the vocational expert, through a series of hypotheticals, to determine whether or not Plaintiff could perform work that existed in the national economy based upon her residual functional capacity.  See 20 C.F.R. Pt. 404, App. 2 § 200.00(b)("when all factors coincide with the criteria of a rule, the existence of such jobs is established.  But when the criteria are not met, the existence of jobs must be 'further considered in terms of what kinds of jobs or types of work may be either additionally indicated or precluded.' "); see also Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999)("[a]lthough the grid results are generally dispositive, exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations."); Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986)(the language of the regulations "indicates that in a case where both exertional and nonexertional limitations are present, the guidelines cannot provide the exclusive framework for making a disability determination.").

The vocational expert testified that while the "lack of bilateral dexterity" narrowed the occupational base, there were at least two jobs in the national economy that someone with Plaintiff's residual functional capacity could perform - an escort, with a DOT code of 353.667-010, and a surveillance system monitor, with a DOT code of 379.367-010.  AR 287-88.  The ALJ even went one step further and asked the vocational expert to presume that someone had the limitation where he or she had no use at all of the right upper extremity.  AR 290.  The ALJ asked that if presuming that limitation would the vocational expert's answer change as to that

individual's remaining occupational base.  Id.  The vocational expert responded that his answer

would remain the same because he "chose jobs that a person could perform with one arm."  Id.

291.

The ALJ credited the vocational expert's testimony, and he found that after considering

Plaintiff's age, education, work experience, and residual functional capacity, that Plaintiff was

capable of "making a successful adjustment to work that exists in significant numbers in the

national economy."  AR 18.

Plaintiff appears to argue that because the expert answered in the negative to the final

hypothetical posed to him, that a finding of disabled was warranted.  The final hypothetical

posed to the expert, which was proposed by Plaintiff and rephrased by the ALJ, was, taking

someone with Plaintiff's limitations and the additional limitation of requiring frequent breaks

during an 8-hour workday, would that individual still be able to do other work.  AR 291.  The

expert answered that "under that RFC"[18] he could not identify any job in the national economy or

regional economy that a person could perform.  Id.  As a result, Plaintiff argues that she should

have been found "disabled."  Plaintiff's argument fails, however, because there is no medical

evidence to suggest that Plaintiff had the limitation of requiring more than the standard number

of breaks during an 8-hour workday.  Additionally, as discussed in Section III(B), *supra*, there is

no basis to disturb the ALJ's findings with respect to Plaintiff's subjective complaints concerning

her physical limitations.

---

[18] RFC stands for "residual functional capacity."

## CONCLUSION

For the foregoing reasons I conclude, and respectfully recommend that Your Honor should conclude, that the Commissioner's motion (Docket #'s 10, 11) should be granted, Plaintiff's cross-motion (Docket # 14) should be denied, and the case should be dismissed.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Kenneth M. Karas at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.

Dated: March 31, 2011
White Plains, New York

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

A copy of the foregoing Report and Recommendation has been sent to the following:

The Honorable Kenneth M. Karas, U.S.D.J.

Counsel of Record for Plaintiff and the Commissioner of Social Security

36